DISTRICT OF NH

FILED

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE , 2018 JAN 11  P 6: 20

24 HOUR DEPOSITORY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:17-cr-00196-JD** |
| | ) | |
| **WILLIAM A. BISCHOFF** | ) | |

---

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United States of America by its attorney, John J. Farley, the Acting United States Attorney for the District of New Hampshire, and the defendant, William A. Bischoff, and the defendant's attorney, Bjorn R. Lange, Esquire, enter into the following Plea Agreement:

1. <u>The Plea and the Offense.</u>

The defendant agrees to (A) waive his right to have this matter presented to a grand jury; (B) waive venue with respect to Count Two of the Criminal Information; and (C) plead guilty to Counts One and Two of the Criminal Information charging him, respectively with Wire Fraud in violation of Title 18, United States Code, Section 1343 and Willfully Failing to File Individual Federal Income Tax Returns in violation of Title 26, United States Code, Section 7203.   The defendant further agrees to the sentencing stipulations set forth in Section 6 of this agreement.

- 1 -

In exchange for the defendant's guilty plea, the United States also agrees to the sentencing stipulations set forth in Section 6 of this agreement.

2. <u>The Statutes and Elements of the Offenses</u>.

(A) Wire Fraud: 18 U.S.C. § 1343

Title 18, United States Code, Section 1343 provides, in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire ... communication in interstate commerce ... any writings, signs, signals [or] pictures ... for the purpose of executing such scheme or artifice, shall be [guilty of a felony.]

18 U.S.C. § 1343.

The defendant understands that the offense of Wire Fraud has the following elements, each of which the government would be required at trial to prove beyond a reasonable doubt:

<u>First</u>, that there was a scheme, substantially as charged in the Criminal Information, to defraud or to obtain money or property by means of false or fraudulent pretenses;

<u>Second</u>, that the scheme to defraud involved the misrepresentation or concealment of a material fact or matter or that the scheme to obtain money or property by means of false or fraudulent pretenses involved a false statement, false assertion, half-truth or knowing concealment concerning a material fact or matter;

<u>Third</u>, that the defendant knowingly and willfully participated in the scheme with the intent to defraud; and

Fourth, that for the purpose of executing the scheme or in furtherance of the scheme, the defendant caused an interstate wire communication to be used on or about the date alleged.

First Circuit Pattern Jury Instructions, Criminal Cases (Hornby/Torresen), Part 4.18.1343

(updated February 1, 2013).

      (B)    Willfully Failing to File Individual Federal Income Tax Returns:   26 U.S.C. § 7203

Title 26, United States Code, Section 7203 provides, in pertinent part:

Any person … required by this title or by regulations made under authority thereof to make a return … who willfully fails to make such a return … at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor.

26 U.S.C. § 7203.

The defendant understands that the offense of Willfully Failing to File Individual Federal Income Tax Returns has the following elements, each of which the government would be required at trial to prove beyond a reasonable doubt:

First, that the defendant was required to file an income tax return for the years 2011 to 2016;

Second, that the defendant failed to file an income tax return for those years; and

Third, that the defendant acted willfully.

First Circuit Pattern Jury Instructions, Criminal Cases (Hornby/Torresen), Part 4.26.7203

(updated March 3, 2008).

3. <u>Offense Conduct</u>.

The defendant stipulates and agrees that if this case proceeded to trial, the government would introduce evidence of the following facts, which would prove the elements of the offense beyond a reasonable doubt:

(A)   <u>Wire Fraud</u>

   (1)   <u>Overview</u>

From at least 2009 until the time he was served with a target letter on September 5, 2017, Bischoff defrauded more than two dozen household-clients of his financial advisory business.   While the details varied from transaction to transaction, each fraudulent transaction began with Bischoff soliciting a client to give him money which he promised to invest in a particular business enterprise or to purchase a particular investment instrument.   Among other things, Bischoff promised to use his defrauded clients' money to make investments for them in real estate, structured legal settlements, high yield notes, and private equity placements in a start-up recycling business.   In many cases, he induced his clients to make such investments by guaranteeing returns that far exceeded market norms.   While Bischoff generally did not reduce the details of each transaction to an investment agreement or other formal writing, he made many of his fraudulent solicitations and communications relating to such solicitations by email.
Bischoff's bank records establish that he diverted significant amounts of the proceeds of his clients' investments from the uses to which he promised to put them.   Bischoff's bank records show that Bischoff used much of the defrauded investors' money to pay personal expenses, engage in personal financial investments, repay other investors and make other payments wholly unrelated to the business enterprises and financial investments for which Bischoff promised he would use the investors' funds.   In addition, in an unprotected recorded interview with law enforcement, Bischoff acknowledged that he never made the investments in structured settlements and notes for which he told some investors he would use their money.

In many instances, the fraudulent nature of the transactions is extraordinarily transparent, because, in those instances, Bischoff deposited investor funds into bank accounts with virtually no other money in them; in other words, they were not commingled with other funds that Bischoff might have been able to use

legitimately for things like paying his personal investments and expenses and repaying other investors.   Accordingly, the bank records show that the ensuing withdrawals and payments from the account that were inconsistent with Bischoff's solicitations could only have been made with investor funds ear-marked for other purposes.   Finally, many of the payments to other investors were made with the proceeds of investments Bischoff solicited while the other investors were pressuring Bischoff to repay monies that he had long since misappropriated.

In an apparent effort to cover up the fact that he had misused and dissipated investors' money, Bischoff periodically created and transmitted, usually by email, account statements to the defrauded investors that falsely showed not only that Bischoff had used defrauded investors' money as he promised to use it but that the defrauded investors had made a lot of money from their investments with Bischoff. In reliance on such statements, a significant number of the defrauded investors chose to leave their money invested with Bischoff even after the terms of their investments, at least as Bischoff represented them, entitled them to repayment.   In fact, after seeing their account statements many investors not only left their money with Bischoff but gave him more money with which to invest on their behalf.   On many occasions, Bischoff converted that money to his own use as well.

In total, during the period from approximately September 2009, until September 5, 2017, Bischoff defrauded no fewer than twenty-six household clients of his investment advisory business.   The total investor losses attributable to Bischoff's fraudulent activity during that period was no less than $4.2 million.   Many of Bischoff's victims were lifelong family friends of Bischoff, having been introduced to Bischoff as children by their parents, who were also friends and clients of Bischoff.

(2)     Representative Transactions

        (a)     R.C.

On November 7, 2011, Bischoff solicited from R.C. a $50,000 investment in a subsidiary of a recycling business called Universal Waste Management with which Bischoff was affiliated.     Bischoff deposited R.C.'s $50,000 check into a bank account he maintained in the name of his investment advisory business, which had an existing balance of just $288.03.   Bischoff used the $50,000 to fund, among other things, a $25,000 check that he deposited to his personal securities brokerage account and which he later used to pay personal expenses, a $10,000 check payable

to cash, a $2000 check payable to Bischoff and payments totaling about $10,600 to various real estate ventures with which Bischoff was affiliated.

R.C., a 64 year old semi-retired residential construction manager, had known Bischoff for approximately forty years and considered Bischoff a trusted friend. R.C. was an unsophisticated investor who generally relied upon registered investment professionals to handle his retirement investments, but Bischoff persuaded him to deviate in this instance.   Bischoff promised to provide account statements but only provided informal email updates.

     (b)    <u>P. and C.C.</u>

On April 20, 2013, Bischoff successfully solicited P. and C.C. to purchase "notes" and "loans" with $276,000 that C.C. had recently received as an inheritance following her mother's death.   Bischoff told P. and C.C. that the notes would generate an annual return of 12.25%.   Bischoff used at least significant portions of the proceeds of the couple's investment for purposes other than purchasing notes and loans on their behalf.   Of the $276,000 P. and C.C. invested, Bischoff used approximately $56,000 to fund checks and wire transfers to himself, which, he in turn, used to pay personal expenses.   He used another $58,000 or so to make payments to other investors from whom he had diverted funds and an additional $42,000 to make payments to a real estate venture he was pursuing for himself. P.C., 60 years old, has known Bischoff his entire life and, until he learned that Bischoff had defrauded him, had considered Bischoff a close and trusted family friend.   P.C. met Bischoff through his parents who were also financial advisory clients of Bischoff and P.C. stated that his mother treated Bischoff as another son. Because of the close relationship they thought they had with Bischoff, P and C.C. did not seek from Bischoff further specifics about the "notes" and "loans" Bischoff said he would purchase for them.  [1]

---

[1]    Over the years, to keep his Ponzi-like activity going, Bischoff effectively misappropriated the equity in the homes of several of his investor victims, including P. and C.C.   In or about June 2014, the P. and C.C. received about $400,000 in net proceeds from the sale of their home in Stratham, N.H.   At the time of the sale, the couple was traveling out of the country.   They requested that Bischoff represent them at closing and hold the $400,000 as payment for a new home that they had not yet identified.   While still traveling, Bischoff informed them that he had found them a new home in Alton, N.H.   Reflecting the high degree of trust they had in Bischoff, the P. and C.C. authorized Bischoff to buy the new home for them sight unseen. Although Bischoff attempted to persuade P. and C.C. to take out a mortgage and use the proceeds from the sale of the couple's old home to invest with him, the couple declined and insisted that Bischoff pay for the Alton home with the cash from the sale of the Stratham home.   Instead, however, Bischoff purchased the home in his own name after obtaining a mortgage loan also in his own name.   When P. and C.C. returned from their travels, Bischoff deeded the home to them but did not tell them that there was an outstanding mortgage in his name on it.   P. and C.C. believed that they owned the home unencumbered until Bischoff eventually defaulted on the mortgage payments and the bank foreclosed on the property.

(c)     A.K.

On or about August 2, 2013, Bischoff solicited investments from A.K. totaling
$35,000.   Bischoff told A.K. that he would use A.K's money to invest in
Universal Waste Management, the recycling company.   According to bank
records, however, Bischoff used approximately $17,500 to repay other investors
from whom Bischoff had previously diverted funds and used the bulk of the
remainder to pay personal expenses, including country club membership dues.
A.K. is a retired doctor who was introduced to Bischoff by his cousin, who
Bischoff was apparently compensating for referring investors to Bischoff.

(d)     W., S., A. and L.F.

On June 1, 2010, Bischoff solicited an investment of $200,000 from W. and S.F.
and their minor children, A. and L.   W. and S.F. understood that they were
investing at least principally in real estate or in Universal Waste Management.
However, according to bank records, none of their money was invested in either.
Bischoff instead deposited W. and S.F.'s money into a bank account maintained by
his advisory business, which at the time had a balance of merely $10.35.   From
that bank account, Bischoff used the W. and S.F.'s money to fund $99,000 in
payments to other investors from whom he had diverted funds, a check to himself
for $30,000, $2300 in country club dues, $35,000 to a personal securities account
which he then appears to have dissipated on personal expenses, a $6000 cash
withdrawal and $10,000 to Bischoff business ventures unrelated to any recycling or
real estate investments Bischoff offered to investors.

On January 25, 2012, Bischoff solicited an additional investment of $400,000 from
W. and S.F.   Again, although Bischoff once more led the W. and S.F. to believe
that they were investing in the recycling business and/or real estate ventures, he
used their money for his own purposes.   Bischoff deposited the couple's $400,000
check into his financial advisory business's account, which this time had a balance
of less than $2500.   Bischoff made numerous transactions with the $400,000 that
were not consistent with what he told the couple he would do with their investment
proceeds, including funding payments of at least $146,000 to other investors from
whom Bischoff had diverted investment proceeds, a payment of $50,000 to
Bischoff's personal securities account and a $5000 check payable to Bischoff.

(e)      J. and V.B.

On June 18, 2012, J. and V.B. paid Bischoff $25,000 to invest in Universal Waste Management.   Instead of investing that money in the recycling company, however, Bischoff used the bulk of it to fund a real estate venture that, according to Bischoff's later admissions, he did not offer to investors.   On June 16, 2014, Bischoff solicited another investment in Universal Waste Management and/or mortgages and notes from the J. and V.B. in the amount of $30,000.   Despite what he told the couple about what he would do with their money, Bischoff transferred most or all of the money to his personal securities and bank accounts, from which he dissipated the money to pay for personal expenses.   J.B. met Bischoff through his father, who was a long-time Bischoff client and another of Bischoff's victims.

(B)    Willful Failure to File Federal Income Tax Returns

Although Bischoff prepared income tax returns for clients, he and his wife failed to file any individual federal income tax returns for themselves for tax years 2011 through 2015, despite the fact that even Bischoff's fraudulently derived income was more than enough to trigger the requirement to file a tax return in each of those tax years.   The following chart reflects the Bischoffs' gross income attributable just to the fraud and their Social Security benefits for each of the tax years and the corresponding amount triggering the filing requirement:

| Tax Year | Amount from Fraud | Soc. Sec. Income - WB | Soc. Sec. Income – BB | Subtotal Est. Reportable Income [1] | GY Req. [2] | Req'd to File [3] |
|---|---|---|---|---|---|---|
| 2011 | $701,921.97 | $13,374.00 | $4,950.00 | $720,245.97 | $21,300.00 | Yes |
| 2012 | 1,281,841.00 | 13,846.00 | 5,134.00 | 1,300,821.00 | 21,800.00 | Yes |
| 2013 | 25,821.08 | 14,086.00 | 5,218.00 | 45,125.08 | 22,400.00 | Yes |
| 2014 | 703,880.36 | 14,290.00 | 5,290.00 | 723,460.36 | 22,700.00 | Yes |
| 2015 | 34,644.51 | 14,542.00 | 5,386.00 | 54,572.51 | 23,100.00 | Yes |
| Subtotal | $2,748,108.92 | $70,138.00 | $25,978.00 | $2,844,224.92 | | |

Notes:

[1]  For purposes of showing the requirement to file a Form 1040, estimated reportable income includes only amounts from theft and social security and therefore excludes income from other sources that may also be reportable.

[2]  Gross Income Requirement (threshold) to file a Form 1040 was based on Married Filing Joint filing status with both spouses over age 65.

- 8 -

<hr>

3  Required to file was determined using gross income test excluding investment income (and did not account for a potential requirement to file under the self-employment test).

Bischoff's failure to file tax returns reporting his fraudulently derived and Social Security income is approximately $568,845.

Bischoff knew that he was required to file tax returns.   Bischoff held himself out as a financial professional.   According to his website, Bischoff started his career at the University of New Hampshire where he was employed as Assistant Treasurer for seven years and then worked for fifteen years at a business, consulting and accounting firm before opening his own business consulting and financial advisory business.   In addition, Bischoff supplemented his investment advisory services by preparing federal and state individual income tax returns at least for tax years 2010 to 2014, a period that substantially overlaps with Bischoff's own failures to file.

4.   <u>Penalties, Special Assessment and Restitution.</u>

The defendant understands that the penalties for the offense are:

(A)   For Count One, a maximum prison term of twenty years (18 U.S.C. § 1343), and for Count Two, a maximum prison term of one year (26 U.S.C. § 7203);

(B)   For Count One, a maximum fine of $250,000.00 or twice the pecuniary gain or loss resulting from the offense, whichever is greater, and for Count Two a maximum fine of $100,000.00 or twice the pecuniary gain or loss resulting from the offense, whichever is greater (18 U.S.C. § 3571(b) and (d)); and

(C)   For Count One, a term of supervised release of not more than three years, and for Count Two a term of supervised release of not more than one year (18 U.S.C. § 3583). The defendant understands that the defendant's failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring the defendant to serve in prison all or part of the term of supervised release, with no credit for time already spent on supervised release; and

(D)   For Count One, a mandatory special assessment of $100, and for Count Two a mandatory special assessment of $25, both payable at or before the time of sentencing (18 U.S.C. § 3013(a)).

In addition to the other penalties provided by law, the Court may order the defendant to pay restitution to the victim(s) of the offense (18 U.S.C. § 3663 or § 3663A).

5.   Sentencing and Application of the Sentencing Guidelines.

The defendant understands that the Sentencing Reform Act of 1984 applies in this case and that the Court is required to consider the United States Sentencing Guidelines as advisory guidelines.   The defendant further understands that he has no right to withdraw from this Plea Agreement if the applicable advisory guideline range or his sentence is other than he anticipated.

The defendant also understands that the United States and the United States Probation Office shall:

(A)   Advise the Court of any additional, relevant facts that are presently known or may subsequently come to their attention;

(B)   Respond to questions from the Court;

(C)   Correct any inaccuracies in the pre-sentence report;

(D)   Respond to any statements made by him or his counsel to a probation officer or to the Court.

The defendant understands that the United States and the Probation Office may address the Court with respect to an appropriate sentence to be imposed in this case.

The defendant acknowledges that any estimate of the probable sentence or the probable sentencing range under the advisory Sentencing Guidelines that he may have

received from any source is only a prediction and not a promise as to the actual

sentencing range under the advisory Sentencing Guidelines that the Court will adopt.

      6. <u>Sentencing Stipulations and Agreements</u>.

      Pursuant to Fed. R. Crim. 11(c)(1)(C), the United States and the defendant

stipulate as follows:

> (a) that an appropriate sentence in this case includes a term of incarceration of
>
> forty-eight months, unless the defendant deposits into the Court's registry,
>
> prior to his sentencing, $1,000,000 or more toward an anticipated restitution
>
> order, in which case a lesser term of incarceration, but under no circumstances
>
> not less than 24 months, may be appropriate: and

> (b) that, if, within ninety days of his entry of a plea of guilty to Count One, the
>
> defendant deposits into the Court's registry $100,000 or more in partial
>
> satisfaction of an anticipated restitution order, the defendant's sentencing shall
>
> be continued for an additional 180 days to give the defendant an opportunity to
>
> make further payments toward an anticipated restitution order before his
>
> sentencing.

The parties intend that the above stipulations be "binding" under Rule 11(c)(1)(C) of the

Federal Rules of Criminal Procedure.   The parties intend that, in this context, the word

"binding" means that, if the Court does not accept the plea agreement under Fed. R.

Crim. P. 11(c)(3)(A), the plea agreement is null and void and the defendant will be

allowed the opportunity to withdraw his guilty pleas (but not his waivers of indictment or venue).

Pursuant to Rule 11(c)(1)(A), the defendant agrees that he will (a) he will, before sentencing, file accurate tax returns for tax years 2011 through 2015; and (b) will cooperate with the IRS regarding the ascertainment and payment of all taxes due, plus interest and penalties and that his ongoing cooperation in those regards will be made a condition of any term of supervised release.

Pursuant to Rule 11(c)(1)(A), the parties further agree that the defendant will be liable for restitution:

    (a)    to defrauded investors, in the approximate total amount of $5,674,645.11;

    (b)    to the U.S. Treasury in the approximate amount $568,845 plus interest under 26 U.S.C. § 6601 and/or 6621 and any interest that may accrue under 18 U.S.C. § 3612, as follows:

        (1)    restitution to the U.S. Treasury is due and payable immediately upon entry of judgment and is subject to immediate enforcement, in full, by the U.S.;

        (2)    if full payment of restitution to the U.S. Treasury cannot be made immediately, the defendant shall make

            (A)    complete and accurate financial disclosures to IRS on forms prescribed by the IRS (including, but not limited to, IRS Form

433-A and Form 433-B, as appropriate), and shall disclose to the IRS any and all additional financial information and financial statements provided to the probation office; and

(B)     disclosure to the probation office of any financial disclosure made to the IRS (including, but not limited to, IRS Form 433-A and Form 433-B, as appropriate).

(3)     the defendant shall make all payments of restitution to the U.S. Treasury to the Clerk of the Court at the following address:

> United States District Court
> District of New Hampshire
> 53 Pleasant Street
> Concord, N.H.   03301

(4)     with each payment of restitution to the U.S. Treasury the defendant shall provide the Clerk of the Court the following information:

(A)     the defendant's name and Social Security number;

(B)     the district court and docket number assigned to this case;

(C)     the tax years for which restitution has been ordered; and

(D)     a statement that the payment is being submitted pursuant to the Court's restitution order.

(5)     the defendant shall send a notice of any restitution payments made to the U.S. Treasury, including the information listed in the preceding sub-paragraph, to the IRS at the following address:

- 13 -

IRS – RACS
Attention:   Mail Stop 6261, Restitution
333 W. Pershing Avenue
Kansas City, Missouri   64108

The parties are free to make recommendations with respect to the terms of imprisonment, fines, conditions of probation or supervised release, and any other penalties, requirements, and conditions of sentencing as each party may deem lawful and appropriate, unless such recommendations are inconsistent with the terms of this Plea Agreement.

7.      Restitution.

The defendant acknowledges that, with respect to restitution, he understands and/or agrees that:

(a)      the total amount of restitution to the U.S. Treasury reflected in this agreement results from the defendant's offense conduct;

(b)      if the Court imposes a schedule of payments, the schedule of payments is a schedule of the minimum payment due, and that the payment schedule will not prohibit or limit the methods by which the United States may immediately enforce the restitution judgment as to the U.S. Treasury in full;

(c)      the IRS will use the amount of restitution ordered to the U.S. Treasury as the basis for a civil assessment under 26 U.S.C. § 6201(a)(4) and that the defendant will not have the right to challenge the amount of this restitution-based assessment, see 26 U.S.C. § 6201(a)(4)(C);

(d)      neither the existence of a restitution payment schedule nor the defendant's

- 14 -

timely payment of restitution according to that schedule will preclude the IRS from immediately collecting the full amount of the restitution-based assessment;

(e)     interest on the restitution-based assessment will accrue under 26 U.S.C. § 6601 from the last date prescribed for payment of the tax liability that is the subject of the restitution-based assessment to the date that the IRS receives full payment;

(f)     although he is entitled to receive credit for restitution paid to the U.S. Treasury pursuant to this Plea Agreement and a resulting restitution order against those assessed civil tax liabilities due and owing for the same periods for which restitution is ordered, this Plea Agreement does not resolve the defendant's civil tax liabilities, that the IRS may seek additional taxes, interest and penalties and from the defendant relating to the conduct covered by this plea agreement and for conduct relating to other periods, and that satisfaction of the restitution debt does not settle, satisfy, or compromise the defendant's obligation to pay any remaining civil tax liability;

(g)     the government may release information to the IRS for purposes of making civil tax and restitution-based assessments; and

(h)     the defendant is not entitled to credit with the IRS for any payment until the payment is received by the U.S. Treasury.

7. <u>Acceptance of Responsibility</u>.

The United States agrees that it will not oppose an appropriate reduction in the defendant's adjusted offense level, under the advisory Sentencing Guidelines, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the offense. The United States, however, may oppose any adjustment for acceptance of responsibility if the defendant:

A.   Fails to admit a complete factual basis for the plea at the time he is sentenced or at any other time;

B.   Challenges the United States' offer of proof at any time after the plea is entered;

C.   Denies involvement in the offense;

D.   Gives conflicting statements about that involvement or is untruthful with the Court, the United States or the Probation Office;

E.   Fails to give complete and accurate information about his financial status to the Probation Office;

F.   Obstructs or attempts to obstruct justice, prior to sentencing;

G.   Has engaged in conduct prior to signing this Plea Agreement which reasonably could be viewed as obstruction or an attempt to obstruct justice, and has failed to fully disclose such conduct to the United States prior to signing this Plea Agreement;

H.   Fails to appear in court as required;

I.   After signing this Plea Agreement, engages in additional criminal conduct; or

J.   Attempts to withdraw his guilty plea.

The defendant understands and agrees that he may not withdraw his guilty plea if, for any of the reasons listed above, the United States does not recommend that he receive a reduction in his sentence for acceptance of responsibility.

The defendant also understands and agrees that the Court is not required to reduce the offense level if it finds that he has not accepted responsibility.

If the defendant's offense level is sixteen or greater, and he has assisted the United States in the investigation or prosecution of his own misconduct by timely notifying the United States of his intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently, the United States will move, at or before sentencing, to decrease the defendant's base offense level by an additional one level pursuant to U.S.S.G. § 3E1.1(b).

8.   Waiver of Trial Rights and Consequences of Plea.

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him. The defendant also understands that he has the right:

A.   To plead not guilty or to maintain that plea if it has already been made;

B.   To be tried by a jury and, at that trial, to the assistance of counsel;

C.   To confront and cross-examine witnesses;

D.   Not to be compelled to provide testimony that may incriminate him;

and

E.      To compulsory process for the attendance of witnesses to testify in his defense.

The defendant understands and agrees that by pleading guilty he waives and gives up the foregoing rights and that upon the Court's acceptance of the his guilty plea, he will not be entitled to a trial.

The defendant understands that if he pleads guilty, the Court may ask him questions about the offense, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers will be used against him in a prosecution for perjury or making false statements.

9.   Acknowledgment of Guilt; Voluntariness of Plea.

The defendant understands and acknowledges that he:

A.      Is entering into this Plea Agreement and is pleading guilty freely and voluntarily because he is guilty;

B.      Is entering into this Plea Agreement without reliance upon any promise or benefit of any kind except as set forth in this Plea Agreement or revealed to the Court;

C.      Is entering into this Plea Agreement without threats, force, intimidation, or coercion;

D.      Understands the nature of the offense to which he is pleading guilty, including the penalties provided by law; and

E.      Is completely satisfied with the representation and advice received from his undersigned attorney.

10.   Scope of Agreement.

The defendant acknowledges and understands that this Plea Agreement binds only the undersigned parties and cannot bind any other non-party federal, state or local authority.   The defendant also acknowledges that no representations have been made to him about any civil or administrative consequences that may result from his guilty plea. The defendant understands such matters are solely within the discretion of the specific non-party government agency involved. The defendant further acknowledges that this Plea Agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving the defendant.

11.   <u>Collateral Consequences</u>.

The defendant understands that as a consequence of his guilty plea he will be adjudicated guilty and may thereby be deprived of certain federal benefits and certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms.

The defendant understands that, if he is not a citizen of the United States, his guilty plea to the charged offense will likely result in him being subject to immigration proceedings and removed from the United States by making him deportable, excludable, or inadmissible, or ending his naturalization.   The defendant understands that the immigration consequences of this plea will be imposed in a separate proceeding before the immigration authorities.   The defendant wants and agrees to plead guilty to the charged offense regardless of any immigration consequences of this plea, even if this plea

- 19 -

will cause his removal from the United States.   The defendant understands that he is

bound by his guilty plea regardless of any immigration consequences of the plea.

Accordingly, the defendant waives any and all challenges to his guilty plea and to his

sentence based on any immigration consequences, and agrees not to seek to withdraw his

guilty plea, or to file a direct appeal or any kind of collateral attack challenging his guilty

plea, conviction, or sentence, based on any immigration consequences of his guilty plea.

      12.  Satisfaction of Federal Criminal Liability; Breach.

      The defendant's guilty plea, if accepted by the Court, will satisfy his federal

criminal liability in the District of New Hampshire arising from his participation in the

conduct that forms the basis of the Criminal Information in this case.   The defendant

understands that if, before sentencing, he violates any term or condition of this Plea

Agreement, engages in any criminal activity, or fails to appear for sentencing, the United

States may consider such conduct to be a breach of the Plea Agreement and may

withdraw therefrom.

      13.  Waivers.

      A.  Appeal.

      The defendant understands that he has the right to challenge his guilty plea and/or

sentence on direct appeal. By entering into this Plea Agreement the defendant knowingly

and voluntarily waives his right to challenge on direct appeal:

      1.    His guilty plea and any other aspect of his conviction, including, but
           not limited to, adverse rulings on pretrial suppression motion(s) or

any other adverse disposition of pretrial motions or issues; and

2.      The sentence imposed by the Court if it is consistent with or lower
        than the stipulated sentence or the stipulated sentencing range
        specified in Section 6 of this agreement.

The defendant's waiver of his rights does not operate to waive an appeal based

upon new legal principles enunciated in Supreme Court or First Circuit case law after the

date of this Plea Agreement that have retroactive effect; or on the ground of ineffective

assistance of counsel.

B.      Collateral Review

The defendant understands that he may have the right to challenge his guilty plea

and/or sentence on collateral review, e.g., a motion pursuant to 28 U.S.C. §§ 2241 or

2255.   By entering into this Plea Agreement, the defendant knowingly and voluntarily

waives his right to collaterally challenge:

1.      His guilty plea, except as provided below, and any other aspect of
        his conviction, including, but not limited to, adverse rulings on
        pretrial suppression motion(s) or any other adverse disposition of
        pretrial motions or issues; and

2.      The sentence imposed by the Court if it is consistent with or lower
        than the stipulated sentence or the stipulated sentencing range
        specified in Section 6 of this agreement.

The defendant's waiver of his right to collateral review does not operate to waive a

collateral challenge to his guilty plea on the ground that it was involuntary or unknowing,

or on the ground of ineffective assistance of counsel. The defendant's waiver of his right

to collateral review also does not operate to waive a collateral challenge based on new

legal principles enunciated by in Supreme Court or First Circuit case law decided after the date of this Plea Agreement that have retroactive effect.

C. Freedom of Information and Privacy Acts

The defendant hereby waives all rights, whether asserted directly or through a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of the case(s) underlying this Plea Agreement, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. §552, or the Privacy Act of 1974, 5 U.S.C. §522a.

D. Appeal by the Government

Nothing in this Plea Agreement shall operate to waive the rights or obligations of the Government pursuant 18 U.S.C. § 3742(b) to pursue an appeal as authorized by law.

14.   No Other Promises.

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement or revealed to the Court, and none will be entered into unless set forth in writing, signed by all parties, and submitted to the Court.

15.   Final Binding Agreement.

None of the terms of this Plea Agreement shall be binding on the United States until this Plea Agreement is signed by the defendant and the defendant's attorney and until it is signed by the United States Attorney for the District of New Hampshire, or an

- 22 -

Assistant United States Attorney.

    16.   Agreement Provisions Not Severable.

    The United States and the defendant understand and agree that if any provision of

this Plea Agreement is deemed invalid or unenforceable, then the entire Plea Agreement

is null and void and no part of it may be enforced.

JOHN J. FARLEY
Acting United States Attorney

Date: __1-11-17__    By:    _____

William E. Morse
Assistant United States Attorney
Bar No. 421934 (D.C.)
53 Pleasant St., 4th Floor
Concord, New Hampshire   03301

    The defendant, William A. Bischoff, certifies that he has read this 23-page Plea
Agreement and that he fully understands and accepts its terms.

Date: __12/28/2017__    _____

William A. Bischoff, Defendant

    I have read and explained this 23-page Plea Agreement to the defendant, and he
has advised me that he understands and accepts its terms.

Date: __12/28/17__    _____

Björn R. Lange, Esquire
Attorney for William A. Bischoff

- 23 -